### EX PARTE FLOYD YOUNG.

No. 5818.     Decided May 5, 1920.

Rehearing Granted May 26, 1920.

**1.—Bail—Practice on Appeal—Capital Punishment—Rule Stated.**

The question is not whether this court would sustain a verdict of the jury inflicting capital punishment, but whether in the opinion of this court a jury in due administration of the law would probably convict and inflict capital punishment. Following Ex Parte Russell, 71 Texas Crim. Rep., 377, and other cases.

**2.—Same—Conflicting Testimony—Practice on Appeal.**

Where, upon appeal from a judgment of the lower court denying bail in a capital case, the evidence was conflicting and ˌpractically all the incriminating facts were controverted, the defendant is entitled to bail, which is now here granted. Following Boyett v. The State, 19 Texas Crim. App., 17, and other cases.

**3.—Same—Reduction of Bail—Rehearing.**

Where, appellant in his motion for rehearing requested that the bail be reduced to the sum of five thousand dollars, the same, after careful consideration, is hereby granted.

Appeal from the District Court of Montgomery during vacation. Tried below before the Honorable B. F. Singleton, District Judge, denying bail to the relator.

This case was originally appealed as No. 5783, and appellant was permitted to withdraw the transcript that the trial judge might certify to same in accordance with the statutes, which was done and the case now heard upon its merits.

*C. W. Nugent,* for relator.

*Alvin M. Owsley,* Assistant Attorney General, for the State.

MORROW, JUDGE.—This is an appeal from the order of the district judge denying bail. Appellant was charged with the murder of Bertha Snooks, a girl about eighteen years of age. The evidence discloses that while sitting in the kitchen at her father's home she was shot and killed, her assailant using a shotgun loaded with buckshot. The State relies upon circumstances to identify the appellant as the assassin. We refrain from making a detailed statement and analysis of the evidence, such being the practice in cases of this character. Sharp v. State, 1 Texas Crim. App., 299; Ex parte Day, 3 Texas Crim. App., 328; Ex parte Sperger, 62 Texas Crim. Rep., 133. The question is not whether this court would sustain a verdict of a jury inflicting capital punishment, but whether in the opinion of this court a jury, in due administration of the law, would probably convict and inflict capital punishment. Ex parte Smith, 23 Texas Crim. App., 100, 5 S. W. Rep., 101; Ex parte Russell, 71 Texas Crim. Rep., 377, 160 S. W. Rep., 76.

The deceased was the daughter of George Snooks. She had several sisters, one of whom was the wife of appellant. The members of the family were farmers, and lived in the same neighborhood, the home of appellant being about a quarter of a mile from that of the father of the deceased. The mother of appellant resided some five miles distant from him, and in traveling from her home to his own he would pass along the road near the home of deceased. At the time the homicide occurred, there was on the premises of the father of deceased a large shallow pond, caused apparently by heavy rains and insufficient drainage. This pond was between the home of appellant and the road mentioned. It was the State's theory that the appellant, after spending a part of the day at the home of his mother, left late in the evening, traveling on horseback on the road mentioned, reached the premises of the father or deceased after dark, hitched his horse to a fence some short distance from the road, waded across the pond and across a potato patch to the house, and, standing near the door, fired the fatal shot, using a twelve-gauge shotgun loaded with buckshot; that he returned by the same road, mounted his horse, and rode to his home, depositing the shoes which he was wearing at the time in the pond as he returned to his horse. It was shown that appellant a short time before the homicide had purchased two buckshot shells, twelve-gauge, and it was also shown that after the homicide the sheriff found at the house of appellant two such shells undischarged. He owned, and had in his house when it was searched by the sheriff shortly after the homicide, a twelve-gauge shotgun, but this, according to the testimony of the sheriff, which was not disputed, had not been recently fired. Some three weeks prior to the homicide he had bought a single-barrel twelve-gauge shotgun, and the next day after he bought it told the dealer he had sold it to a negro. The whereabouts

of this gun at the time of the homicide was not otherwise shown. From the pond to the house, and from the house to the pond, tracks were plainly visible, they having been made by a woman's shoes with certain peculiarities, and after the homicide a pair of such shoes were found in the pond, with circumstances indicating that they had been recently deposited there. There was evidence that the shoes mentioned belonged to the wife of appellant, and had been seen at his house before the homicide. This fact was strongly controverted by the appellant, his wife, and several other witnesses. There was also a controversy and conflict of evidence as to whether the foot of appellant was of a size that would permit him to wear the shoes. There were tracks indicating that a horse had been hitched near the pond, and there were tracks near this horse, made by a person wearing heavy boots. The tracks were imperfect, and not otherwise identified. The appellant's boots and perhaps his pants were wet. This was accounted for from the appellant's standpoint by proof that the weather was rainy, that he had been working in his mother's potato patch in the rain, and had driven his wagon into a pond at her house in order to clean it out for use in hauling cotton, and in so doing had gone to a depth that wet his clothes. There was testimony that tracks made by one of the horses driven by appellant to his buggy at the funeral of the deceased were similar to the tracks of the horse which were traced to the home of appellant on the morning after the homicide. There was much room for controversy from the circumstances touching the identity of the horse making the tracks. The peculiarity was not shown to have been marked or uncommon, nor was the foot of appellant's horse examined to determine its presence thereon.

The shot was fired near eight o'clock in the evening. there being some conflict as to the exact time. The appellant sought to show by witnesses who were with him on his way home from his mother's house that he must have reached home before the shot was fired. His wife testified at the time it was fired he was milking the cows at his home.

The deceased, some two years before her death and while living at appellant's house, had given birth to an illegitimate child. It was the State's theory that appellant was its father, and the motive for the crime was resentment because of the unwillingness of the deceased to continue illicit relations with him. The appellant and his wife took the child to Houston to an infirmary, from which it was placed with persons to raise. The mother of deceased, and some of deceased's sisters, testified that she had told them that the child was that of appellant. Against this it was proved that she had sworn in the grand jury that another person was the parent of the child, and had also made a similar statement to others. Annoymous letters found among the effects of the deceased, seeking to arrange a clandestine meeting and threatening violence upon refusal, were introduced, and the opinion of witnesses *pro* and *con* taken as to the identity of the handwriting with that of appellant, an irreconcilable conflict being developed.

Two of the sisters of the deceased had given birth to illegitimate children, with which it was made plain that appellant was not connected. He had taken some interest in aiding these women, and one of them had received some money from him. There was evidence negativing any secret association with the deceased by the appellant during the two years intervening between the birth of her child and her death, and during this time the relations between the appellant and the members of the family of deceased were friendly and visits were exchanged.

This is a summary of the evidence upon which we reach the conclusion that we cannot approve the judgment of the trial judge refusing appellant bail. While the fact that the evidence is conflicting is not conclusive of the right to bail—Smith v. State, 23 Texas Crim. App., 145; Ex parte Jones, 31 Texas Crim. Rep., 422—in deciding the question involved in this character of proceeding, a consideration of the nature of the evidence for both the State and the accused cannot be overlooked. Assuming that the facts proved on behalf of the State would be sufficient to support the verdict of the jury assessing capital punishment, such verdict would be supported by the judgment of the jury touching the credibility of the witnesses, and the weight to be given their testimony. So supported on appeal, the truth of the criminating facts relied on by the State would stand established, and the issues dependent upon conflicting evidence resolved against the accused. The office of this court on appeal would be to determine whether the established facts justify the conclusion of guilt and authorize the punishment assessed when measured by the rules applicable to circumstantial evidence. As the matter is now presented the truth of practically all of the criminating facts is controverted, and to hold the proof evident. it would be necessary for this court to determine these conflicts against the appellant and to draw the conclusion that a jury, in the due administration of justice, would probably convict the appellant of a capital crime and assess the punishment accordingly. In our opinion. under the facts of this case it is the right of the appellant to have bail pending the decision by a jury which of the conflicting facts are established and whether inference of guilt would be drawn from them. Analogous cases, we think, are numerous, among them Ex parte Boyett, 19 Texas Crim. App., 17; Ex parte Catney, 17 Texas Crim. App., 332; Ex parte Coldiron, 15 Texas Crim. App., 464; Ex parte Duncan, 27 Texas Crim. App., 485; In re Foulk, 13 S. W. Rep., 746; Ex parte Gallaher, 25 Texas Crim. App., 455; Ex parte Gilstrap, 14 Texas Crim App., 240; Ex parte Jones, 26 Texas Crim. App., 597; Ex parte Locklin, 72 S. W. Rep., 585; Ex parte Pace, 16 Texas Crim. App., 541; Ex parte Smith, 26 Texas Crim. App., 136.

The judgment is reversed, and bail allowed in the sum of $10,000.

*Bail granted.*

ON REHEARING

May 26, 1920.

MORROW, JUDGE.—On a former day of this term the judgment of the District Court of Montgomery county denying appellant bail was reversed and bail granted in the sum of ten thousand dollars. Appellant has filed a motion for rehearing herein requesting that same be granted to the extent of reducing said bail to the sum of five thousand dollars, for the reason that it is impossible for the appellant to make bail in so large a sum, and that same is excessive.

Upon a careful review of the evidence, in connection with appellant's motion for rehearing, we have reached the conclusion that the amount of appellant's bail should be reduced and his bond fixed in the sum of five thousand dollars. To this extent the rehearing is granted with instructions that upon his execution of the proper bond in said sum he shall be discharged as provided by law.

*Bail reduced.*